# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| BLACK WARRIOR RIVERKEEPER, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, et al., | ) | Case No. 2:15-cv-01893-JEO |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| GLOBAL MET COAL (USA) CORP., | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

## MEMORANDUM OPINION

This case involves the issuance of a permit by the United States Army Corps of Engineers ("Corps") for the Black Creek Mine pursuant to Section 404 of the Clean Water Act ("CWA"). The permit authorizes Global Met Coal Corporation ("Global Met") to discharge dredge or fill material into waters of the United States, specifically Crooked Creek and the Locust Fork of the Black Warrior River, in Jefferson County, Alabama, in connection with surface coal mining operations. Plaintiffs Black Warrior Riverkeeper, Inc. and Defendants of Wildlife contend the permitting violates the Endangered Species Act ("ESA"), 16 U. S. C. §§ 1531-

1544, as well as the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f.[1]  Plaintiffs ask the court[2] to vacate and remand the permit for compliance with these statutes.

The court has before it three motions for summary judgment.  Plaintiffs filed a motion for summary judgment (doc. 54), and each Defendant filed a cross motion for summary judgment, (docs. 59, 61).  All motions are fully briefed, (docs. 55, 58, 59-1, 60, 62-64), and ripe for decision.  For the reasons that follow, Plaintiff's motion for summary judgment is due to be denied and Defendants' motions for summary judgment are due to be granted.

## I.     REGULATORY FRAMEWORK

Two statutes are at play in this case, the ESA and the NEPA.  Before diving into the factual and procedural background of the case, the court first discusses the underlying regulatory framework for the permit decision at issue.

---

[1] Although the amended complaint asserts claims under the CWA, Plaintiffs abandoned these claims at the summary judgment stage.  (*See* Docs. 55, 62, 65).  As such, summary judgment is proper as to all claims alleging violation of the CWA.  *See Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (district court "properly treat[ed] as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment").

[2] The action was originally assigned to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and the court's general order of reference dated January 2, 2015.  The parties have since consented to an exercise of plenary jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (Docs. 15, 30).

## A.  The Endangered Species Act

The ESA charges federal agencies with the task of carrying out the Congressional policy of conserving endangered or threatened plant and animal species.  16 U.S.C. § 1531(b).  Section 4 of the ESA directs the Secretaries of the Interior and Commerce to determine whether a species should be listed as either "endangered" or "threatened."  16 U.S.C. § 1533.  It also directs them to designate critical habitats for such listed species to the "maximum extent prudent and determinable."  16 U.S.C. § 1533(a)(3)(A).

To that end, section 7 of the ESA requires every federal agency to insure that its actions are not likely to "jeopardize the continued existence of any species listed as endangered or threatened or result in the destruction or adverse modification of habitat of such species. . . ."  16 U.S.C. § 1536(a)(2).   If the agency proposing the action ("action agency") determines that its action will have "no effect" on listed species or critical habitat, no consultation is required.  *See* 50 C.F.R. § 402.14(a). If, however, the action agency determines that its action "may affect" a listed species or critical habitat, it must consult informally or formally with either the Fish and Wildlife Service ("the Service") or the National Marine Fisheries Service ("NMFS"), depending on the species at issue. 50 C.F.R. § 402.14(a)-(b).

Informal consultation is "an optional process that includes all discussions, correspondence, etc., between [an action agency and consulting agency], designed

to assist the [action] agency in determining whether formal consultation . . . is required." 50 C.F.R. § 402.13(a). "If during informal consultation it is determined by the [action] agency, with the written concurrence of the [consulting agency], that the action is not likely to adversely affect listed species or critical habitat, [then] the consultation process is terminated, and no further action is necessary." *Id*. But if formal consultation is required, the consulting agency must prepare a biological opinion advising the action agency regarding "whether the action . . . is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(4).

## B. The National Environmental Policy Act

Agencies are also required by statute to consider the environmental consequences of their actions more generally. *See Hill v. Boy,* 144 F.3d 1446, 1449 (11th Cir. 1998); *C.A.R.E. Now, Inc. v. Fed. Aviation Admin.,* 844 F.2d 1569, 1572 (11th Cir. 1988). While not a substantive environmental statute, NEPA creates "a particular bureaucratic decisionmaking process" and has "twin aims." *Baltimore Gas & Elec. Co. v. Natural Res. Defense Council*, 462 U.S. 87, 97 (1983). First, NEPA forces government agencies to "consider every significant aspect of the environmental impact of a proposed action." *Id*. (quotation omitted). Second, NEPA mandates that government agencies inform the public of the

potential environmental impacts of proposed actions and explain how their decisions address those impacts. *Id*.

"NEPA establishes procedures that a federal agency must follow before taking any action." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008). To comply with NEPA, an agency must first determine whether the action is a "major federal action[] significantly affecting the quality of human environment." 42 U.S.C. § 4332(c); *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1214-15 (11th Cir. 2002). This determination generally requires preparation of an environmental assessment ("EA"). 40 C.F.R. § 1501.4; *Hill,* 144 F.3d at 1450). The EA is a brief and concise document containing sufficient evidence and analysis that allows the agency to determine whether to prepare a more detailed statement of environmental consequences, known as an Environmental Impact Statement ("EIS"). 40 C.F.R. §§ 1501.4, 1508.9. The EA must "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b). This review includes both the direct and indirect impacts. 40 C.F.R. § 1508.8. "The EA should provide enough evidence and analysis to guide the agency to one of two conclusions: (1) a finding that the project will have a significant effect, or (2) a finding of no significant impact." *Sierra Club*, 295 F.3d

at 1215. If the Corps decides that the environmental consequences of the action are not sufficient to justify the preparation of an EIS, the agency must prepare a finding of no significant impact "briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared." 40 C.F.R. § 1508.13.

## II.  ADMINISTRATIVE RECORD AND PROCEDURAL HISTORY

### A.  The § 404 Permit for Black Creek Mine

In September 2012, Global Met applied for a § 404 permit for a surface coal mine, the Black Creek Mine, in Jefferson County, Alabama.[3]  (USACE11; USACE 3907-08).[4]  The Locust Fork River is on the western border of the proposed mine and Crooked Creek surrounds the northern border and over half of the eastern border.  (USACE69; *see also* Docs. 55-1 and 55-2).

In October 2012, the Service notified the Corps that nine listed aquatic species, and one candidate species, may live within or near the proposed Black

---

[3]  The Corps does not have authority under § 404 to regulate water quality of point source discharges.  Instead, § 402 of the CWA, the National Pollutant Discharge Elimination System ("NPDES"), confers that authority to the Alabama Department of Environmental Management ("ADEM").  ADEM must first issue a § 401 water quality certification before the Corps can issue a § 404 permit.  ADEM issued the required water quality certification on June 16, 2014. (USACE2005, USACE3905).

[4]  Citations throughout this section and the discussion section are to the two administrative records from both of the agencies involved in the permit decision.  Citations to the Corps' record are designated as USACE[number] and citations to the Fish and Wildlife Services' record are designated as FWS[number].  These numbers are bates stamped on the bottom of the pages of the administrative record.

Creek Mine. (USACE69, USACE3914). The Service also noted that six of the nine species, specifically the mussel species, had designated critical habitat abutting the mine in the Locust Fork. (USACE69).

Yokley Environmental Consulting Service surveyed the project area in October 2012. Yokley found suitable habitat for mussel and Cahaba shiners, as well as plicate rocksnails, a federally listed species, in the project area. (USACE3943). After reviewing the survey, in December 2012, the Service stated it was "troubled" by the current sediment load in Crooked Creek, (FWS49), and "expressed concern with the habitat quality in Locust Fork" and "recommended strict adherence to best management practices . . . and proposed sediment controls (i.e. sediment ponds, diversion, silt fencing, etc.)." (USACE3914-15; FWS74-75). Additionally, the Service noted the 100-foot setback along both creeks and stated it "appreciate[d] any additional measures that would give additional buffer or sediment protections to these creeks, as any additional impairment will only further degrade an already stressed habitat." (FWS75). That being said, the Service concluded that if best management practices and sediment controls were implemented and fully adhered to, impacts to the listed aquatic species could be minimized. (*Id*.). The Service did not require any further endangered species consultation unless there was some sort of change in the project or information related to the listed species. (*Id*.).

In June 2013, Global Met submitted the application and mitigation plan for its § 404 permit to the Corp.  (USACE3915).  The public had an opportunity to comment on the application between late June and late August 2013. (USACE3908, USACE3923).  The Service did not submit any comments.  At the end of the comment period, the Corps contacted the Service and it responded that it "did not intend to submit comments to the Corps because they did not have any additional comments to add" since those stated in December 2012.  (USACE3915).

The Corps requested and received a § 401 water quality certification from the Alabama Department of Environment Management ("ADEM") in June 2014. (USACE3908, USACE2005).  Six month later, in December 2014, the Corps issued an EA for the permit for the Black Creek Mine.  (USACE3905-71, USACE 3920-28).  The Corps concluded that the permit would have "no effect" on each of "the species of concern in the project area."  (USACE3919, USACE3956-57).

**B.  Suspension of the Permit**

On July 24, 2015, Plaintiffs sent a notice of intent to sue to the Department of the Interior, Fish and Wildlife Service, and the Corps challenging the Black Creek Mine permit and asserting that the Corps failed to comply with the consultation requirements of the ESA in reaching its determination that the project would have no effect on the listed species.  (USACE3615-26).  After receipt of the notice of intent, the Corps internally reviewed the permit, and on September 25,

2015, concluded the permit should be suspended "to re-evaluate the effects of the project to threatened and endangered species and critical habitat." (USACE3660-61).

The instant complaint was filed on October 27, 2015. (Doc. 1). Plaintiffs sought a declaratory judgment that the permit is invalid and an injunction requiring Global Met to suspend activities authorized under the permit, among other relief. (*Id.*). Three days later, on October 30, 2018, the Corps suspended the permit to conduct additional consultation with the Service. (USACE3615, USACE4076-77). Based upon this suspension and upon joint motion of the parties, the court stayed the complaint pending the completion of the consultation with the Service. (Docs. 10-11, 14, 17, 19, 21, 31).

**C. Re-evaluation of the Permit**

For purposes of the re-evaluation, the Corps identified 13 listed or candidate species that "have the potential to occur in the action area." (USACE5839-40). Those species included the following:

- 6 mussel species: Alabama moccasinshell (threatened), orangenacre mucket (threatened), ovate clubshell (endangered), upland combshell (endangered), triangular kidneyshell (endangered) and dark pigtoe (endangered)
- 1 snail species: plicate rocksnail (endangered)
- 1 salamander species: Black Warrior waterdog (candidate)
- 1 turtle species: flattened musk turtle (threatened)
- 2 fish species: rush darter and Cahaba shiner (endangered)
- 2 bat species: Indiana bat and northern long-eared bat

As part of the process, and at the request of the Alabama Surface Mining Commission ("ASMC"), Global Met contracted with biologists at CCR Environmental Inc. ("CCR") to conduct an updated species and habitat survey. (*See* USACE5911, 5750-83). CCR conducted an aquatic species survey of Crooked Creek and Locust Fork on April 26-28, 2016. (*See* USACE5750-83). No listed aquatic species were found and "[s]uitable habitat was lacking from much of the project area." (USACE5756). That being said, the CCR survey noted a "large shoal in Locust Fork immediately downstream of Crooked Creek [that] had some suitable habitat for the target mollusk and fish species and the [flattened musk turtle] and [Black Warrior waterdog" as well as a "pooled area [with] some marginally suitable habitat for the black-knobbed map turtle and Alabama map turtle." (*Id.*). Additionally, CCR conducted a habitat assessment for potential summer and winter habitat for the Indiana bat and northern long-eared bat on January 11-1, 2016, and January 26, 2016. (*See* USACE5785-835). "No known or observed sites . . . [for] winter hibernating habitat" were found and the "potential summer maternity roosting habitat . . . is only present on 11.7 acres of the project area."[5] (USACE5811).

On July 7, 2016, based on these updated surveys, the Corps initiated informal consultation with the Service. (USACE 5839-41). The letter included

---

[5] The 11.7 acres of potential summer roosting bat habitat was later cleared. (USACE5714).

10

copies of the updated species and habitat survey reports, the information regarding the bat habitat, and a summary of the effects determination made by the Corps. Specifically, the Corps informed the Service that the following species have the potential to occur in the action area: the Alabama moccasinshell, orangenacre mucket, ovate clubshell, upland combshell, triangular kidneyshell, dark pigtoe, flattened musk turtle, Black Warrior waterdog, plicate rocksnail, rush darter, Cahaba shiner, Indiana bat, and northern long eared bat. (USACE5839-40). It also stated that the Locust Fork adjacent to the project area is designated a critical habitat for the six mussels listed above. (USACE5840). Although none of the listed aquatic species were found in the CCR study, the Corps found "there is designated critical habitat and presence of some suitable habitat for some of the listed species in Locust Fork." (*Id.*). As such, the Corps determined the project "may affect" the following species: the Alabama moccasinshell, orangenacre mucket, ovate clubshell, upland combshell, triangular kidneyshell, dark pigtoe, flattened musk turtle, Black Warrior waterdog, plicate rocksnail, and Cahaba shiner. That being said, because of the minimum 100-foot setback, as well as utilization of best management practices to minimize potential adverse impacts to water quality, the Corps determined the project was "not likely to adversely affect" the species listed above and designated critical habitat for the six mussels." (*Id.*). Additionally, the Corps determined the project "would have 'no effect' to the rush

darter due to the lack of available habitat in the action area" and "would have 'no effect' to the Indiana bat and northern long-eared bat because the summer roosting habitat was removed within the recommended tree clearing time frame . . . and there is no winter habitat in the action area." (USACE5841).

The Service responded on July 14, 2016, and concurred with the effects determinations made by the Corps. (USACE5843-44). Specifically, the letter stated that as long as best management practices are installed and properly maintained throughout the life of the project to minimize erosion and sedimentation, the Service concurred with the Corps' determination of "may affect, but not likely to adversely affect" the designated species. (*Id*.). The Service further agreed with the "no effect" determination given the habitat of the rush darter, Indiana bat, and northern long-eared bat, although it was not required to do so. (*Id*.).

Approximately two months later, the Corps received a letter from Mark Bailey of Conservation Southeast, Inc., dated September 26, 2016. (USACE5846-49). The letter commented on the survey work performed by CCR regarding the flattened musk turtle and Black Warrior waterdog. Generally, Bailey questioned the expertise of the biologist who conducted the aquatic species survey and asserted CCR significantly deviated from protocol for flattened musk turtle sampling during the survey. (USACE5846-48). A few weeks later, the Corps

received a letter from Douglas N. Shelton of the Alabama Malacological Research Center, who also commented on the survey work done by CCR. Shelton specifically criticized the mollusk survey work and questioned the qualifications of the biologist who conducted the survey. (USACE5851-55).

Additionally, the Corps received a mollusk survey report conducted by Dr. Michael Gangloff dated December 22, 2016.[6] (USACE5856-83). Dr. Gangloff conducted mollusk surveys in the Locust Fork on October 28 and 29, 2016. Four sites in Locust Fork were sampled. Site 1 is approximately 2,200 feet downstream of the action area and approximately 4,600 feet downstream of the Crooked Creek confluence with Locust Fork. Site 2a is located on the left descending bank and mid channel immediately downstream of the Crooked Creek confluence and within the action area. Site 2b is located on the right descending bank of Locust Fork just upstream of the Crooked Creek confluence and outside of the action area. Site 3 is located on Locust Fork approximately 6,900 feet upstream of the Crooked Creek confluence and outside of the action area. Populations of the plicate rocksnail were found at Site 1, Site 2b, and Site 3. Dr. Gangloff also recovered two fresh dead shells of the triangular kidneyshell at Site 1. (USACE5857-83).

Finally, the Corps received a survey report prepared by Drs. Bernard Kuhajda and David Neely of the Tennessee Aquarium Conservation Institute dated

---

[6] The report states it was prepared for Black Warrior Riverkeeper, Southern Environmental Law Center, and Defenders of Wildlife. (USACE5857).

December 28, 2016.[7]  (USACE5885-900).   Drs. Kuhajda and Neely conducted fish surveys at six sites on the Locust Fork and Crooked Creek on October 13, 2016.  (USACE5886).   A total of 23 species of fish were collected, 40 of which were Cahaba shiners. (USACE5887).  Over half, or 26 of the Cahaba shiners, were found in the riffle upstream of the mouth of Crooked Creek, 11 in the first riffle downstream of the mouth of Crooked Creek, 1 in the second riffle downstream of the mouth of Crooked Creek, and 2 in the third riffle downstream of the mouth of Crooked Creek.  (*Id*.).  Among other collected fish species, the survey also noted collection of the coal darter, an imperiled fish species.  (*Id*.).

On January 31, 2017, after consideration of the documents and surveys submitted, the Service wrote a letter to the Corps addressing each document and made recommendations for further assessments by the Corps.  (USACE5902-09).  As for Bailey's concerns, the Service disagreed with his assessment that the biologist lacked the expertise to conduct the flattened musk turtle sampling and that he significantly deviated from sampling protocol.  (USACE5904-05).  That being said, the Service did agree that the trapping duration for the flattened musk turtle was inappropriately shortened from a minimum of three consecutive days and nights to two nights.  (USACE5905).  The Service also agreed that CCR under surveyed the study area for the flattened musk turtle and that the sampling for the

---

[7] The survey was prepared for Black Warrior Riverkeeper, Southern Environmental Law Center, and Defenders of Wildlife.  (USACE5885).

Black Warrior waterdog was not conducted during the most ideal conditions because it is a winter species and sampling was done in the spring. (*Id.*). However, the Black Warrior waterdog was only a candidate and not threatened or endangered species at the time of the survey, so no survey for that species was required. (USACE5906). Further, with regard for Shelton's letters, the Service reiterated that it had no reason to question the biologist's qualifications and found no indications that the mollusk survey was inadequate. (USACE5906-07).

As for Dr. Gangloff's mollusk survey, the Service agreed that CCR did not survey the same upstream or downstream reaches surveyed by Dr. Gangloff. (USACE5907). When questioned by the Service, the CCR biologist could not provide any insight as to why he did not locate any plicate rocksnail on the right descending bank. (USACE5907-08). That being said, the Service noted large differences in flow rates between the CCR and Gangloff surveys. (USACE5908). The flows in Locust Fork were very high during the CCR survey, but Dr. Gangloff's survey took place during a drought and the flow was significantly lower. (*Id.*). The Service noted that Dr. Paul Johnson of Alabama Department of Conservation and Natural Resources stated that plicate rocksnails move to the deepest parts of the channel during high flows and can be harder to survey during those conditions. (*Id.*). During low flows they tend to distribute across the channel

margins. (*Id.*). The Service opined that the flow difference might explain the lack of plicate rocksnails identified during the CCR survey. (*Id.*).

Additionally, Dr. Gangloff noted a likely misidentification of 43 southern fatmucket mussels by the CCR biologist. (*Id.*). The Service again spoke with Dr. Johnson who indicated these mussels were likely triangular kidneyshells that came to the surface to spawn during April and the two mussels can be confused given similar shell characteristics. (*Id.*). Dr. Johnson indicated it is unlikely that such a large number of fatmucket mussels would have been found in this location. (*Id.*). The question, however, could not be resolved because the CCR biologist did not take any pictures of what he labeled as the southern fatmucket. (*Id.*).

Finally, with regard to the fish survey report of Dr. Kuhajda and Neely, the Service could not determine why CCR or Yokley did not find any Cahaba shiners in their previous surveys. (USACE5908). The Service agreed that given the latest survey with documented photographs, the Cahaba shiner is present within the Locust Fork, adjacent to the proposed mine. (*Id.*).

The Service recommended that the new information presented in Dr. Gangloff's and Drs. Kuhajda and Neely's reports be assessed by the Corps. (USACE5909). The Service also stated that the Corps should obtain additional surveys for the flattened musk turtle and Black Warrior waterdog given the shortened survey length for the flattened musk turtle and the proposed listing as

endangered for the Black Warrior waterdog. (*Id*.). Following these actions, the Service instructed the Corps to prepare a new effects determination. (*Id*.).

On February 13, 2017, the Corps responded to the recommendations made by the Service. Specifically, the Corps stated as follows:

> The [Corps] agrees with the [Service] that the sampling length for the [flattened musk turtle] was improperly shortened by CCR. We also recognize that the [Black Warrior waterdog] has recently been proposed for listing as endangered under the ESA. The [Corps] understands there is suitable habitat for the [flattened musk turtle] and [Black Warrior waterdog] in Locust Fork adjacent to the proposed mine site; however, the presence or absence of these species does not change the [Corps'] effects determination. The applicant has not proposed direct impacts to the Locust Fork therefore the [Corps] will not require additional surveys for the [flattened musk turtle] and [Black Warrior waterdog].

> The applicants [sic] mining plan proposes a minimum 100 foot setback along Locust Fork and Crooked Creek as well as utilization of best management practices (BMP) to minimize potential adverse impacts to water quality. The Alabama Department of Environmental Management (ADEM) has issued a Clean Water Act Section 402 National Pollutant Discharge Elimination Standard (NPDES) permit. All surface drainage from disturbed areas must be passed through a siltation structure prior to leaving the project boundary as per ASMC Regulations . . . . All discharges from the sediment ponds are required to meet NPDES standards and must fall within the recommended ranges for fresh water organisms. . . . The USACE has no reason to believe otherwise that the applicant will meet the requirements of the NPDES permit issued by ADEM. Any secondary impact associated with the discharge of fill material would be insignificant in that take would not occur because of the BMP requirements established in the ADEM NPDES permit.

> For these reasons the USACE has determined the project "may affect" but is "not likely to adversely affect" the Alabama moccasinshell, orangenacre mucket, ovate clubshell, upland

17

combshell, triangular kidneyshell, dark pigtoe, [flat musket turtle], (Black Warrior waterdog], plicate rocksnail, Cahaba shiner, or any designated critical habitat for the six mussels listed above.

(USACE5912-13).  The letter ended by asking for an evaluation of the project and comments and/or concurrence regarding the effects determination within 30 days. (USACE5913).

On March 8, 2017, the Service concurred with the Corps' effects determination.    (USACE5915-16).    The Service noted the initial effects determination and review of the information and surveys by Bailey, Shelton, Gangloff, Kuhajda and Neely, as well as the previous recommendation that the Corps prepare a new effects determination on the basis of specific findings. (USACE5915).  The Service summarized the revised determination and concluded that "[b]ased upon a review of our records and the information provided in your [February 13, 2017] letter, we concur with your determination that the project actions may affect, but are not likely to adversely affect the listed species listed above." (USACE5915-16).

On April 24, 2017, the Corps published a Supplemental Environmental Assessment ("EA") regarding the project.  (USACE5712-47).  The Supplemental EA detailed the above chronology of events, (USACE5713-19), and stated the Corps' final ESA effects determination, (USACE 5720-21).   The action area

included the entire mine site and approximately 2,600 feet of Locust Fork and 6,400 feet of Crooked Creek adjacent to the project boundary.[8] (USACE5720).

The Corps then went on to evaluate its compliance with the guidelines enumerated in Section 404(b)(1) of NEPA. In its cumulative impact analysis, the Corps identified the relevant geographic areas as the Lower and Middle Locust Fork.[9] (USACE5734). It identified the direct impacts as the fill of ephemeral and intermittent streams as well as wetland, and the indirect impacts as water quality issues, dust, and ambient noise. (USACE5735). The Corps concluded that any water quality issues would be addressed through the National Pollutant Discharge Elimination System ("NPDES") permit for the mine. (*Id.*).

The Corps then considered a wide variety of other activities within the project geographic area. The Corps acknowledged that coal mining and timber removal activities had occurred in the region for several decades, but because these activities occurred before the enactment of the Surface Mining Control and

---

[8] The Corps explained that "[d]esignated critical habitat exists in Locust Fork adjacent to the project site to the west [and] Crooked Creek is a perennial stream adjacent to the project site to the north and east." (USACE5720). Because of "the close proximity of the project to Locust Fork and Crooked Creek the ESA action area extends to assess the effects of proposed activities on eligible species in Locust Fork and Crooked Creek adjacent to the project site." (*Id.*).

[9] In the original EA, the Corps identified only the Lower Locust Fork as the relevant geographic area. (USACE3944-45). The complaint, however, challenged that area and contended the cumulative impact analysis should include the Middle Locust Form in the cumulative impact analysis. Although the Corps disagreed, it included both the Lower and Middle Locust Fork in its supplemental EA because of the allegations in the complaint. (USACE5734).

Reclamation Act ("SMCRA")[10] and the CWA, the Corps found that these "pre-SMCRA and pre-CWA impacts are relevant as they have set a baseline condition for water quality and aquatic habitat values within the watershed." (USACE5737). The Corps identified other active and abandoned coal mines and found this land collectively accounted for approximately 3.8% of the entire watershed, with 1.6% being active mines. (USACE5739). The Corps acknowledged ADEM had placed the Locust Fork on its § 303(d) list, but noted that the list attributes this impairment to "agriculture and abandoned surface mines." (USACE5738). Finally, the Corps acknowledged the prevalent residential and commercial development within the watershed which has also contributed to the baseline condition. (USACE5741).

Turning to the cumulative effects of these activities, the Corps concluded that active mining would increase the levels of disturbed land within the watershed, but that concomitant reclamation acreage would also increase. The Corps noted that "water quality associated with streams in this watershed has not been significantly impacted by permitted mining activities." (USACE5742). Thus, the Corps found "the watershed would continue to assimilate the mining activities that are occurring within the watershed provided those activities are conducted in

---

[10] The Surface Mining Control and Reclamation Act of 1977 is the primary federal law that regulates the environmental effects of coal mining in the United States. The SMCRA created two programs: one for regulating active coal mines and a second for reclaiming abandoned mine lands. 30 U.S.C. § 1201, *et seq.*

accordance with the terms and conditions of the SMCRA and CWA authorizations." (*Id.*).

In its conclusion, the Corps again acknowledged mining activities before 1977, when the SMCRA was enacted, "most likely resulted in some cumulative impacts," but that "current . . . CWA requirements and SMCRA regulations are very rigorous and mining activities are more closely regulated." (USACE5745). In fact, the Corps noted that "[r]ecent water quality and biological data has indicated the watershed is sufficiently absorbing the impacts without significant aquatic impairment and/or degradation." (USACE5745). The Corps concluded that "[i]n this context, it is not expected that Black Creek Mine would, when combined with other mining activities within the Middle and Lower Locust Fork watersheds, result in significant cumulative impacts to the human and/or aquatic environment." (USACE5745-46).

The Corps, therefore, recommended reinstatement of the permit but modified to include the minimum 100-foot setback along Locust Fork and Crooked Creek and to install and maintain best management practices throughout the life of the project to minimize erosion and sedimentation. (USACE5746). The Corps made the "final determination that the reinstatement of this permit, with an additional special condition, will not have a significant adverse effect on the

quality of the human environment; therefore, an environmental impact statement" is not required.  (*Id.*).

### D.  Reinstatement of the Permit

On May 10, 2017, the Corps authorized reinstatement of the permit subject to the acceptance of the special conditions of the 100-foot setback and installation and maintenance of best management practices to minimize erosion and sedimentation.   (USACE6159).  Global Met accepted reinstatement of the permit with the special conditions on May 12, 2017.  (USACE6161).  Upon reinstatement of the permit, Plaintiffs filed an amended complaint on September 13, 2017, and the stay was automatically lifted.  (Docs. 31, 42).

## III.   STANDARD OF REVIEW

Generally, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, in the case of a district court reviewing final agency action, as here, the rules governing summary judgments do not apply because of the limited role of a court in reviewing the administrative record.  *See  N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007); *J.N. Moser Trucking, Inc. v. U.S. Dep't of Labor*, 306 F. Supp. 2d 774 (N.D.Ill. 2004).  It is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas "the

function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70 (9th Cir. 1985). Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the standard of review. *See Bloch v. Powell*, 227 F. Supp. 2d 25, 31 (D.D.C. 2002) (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C.Cir.1977)).

The Corps' decision to grant the Section 404 permit is subject to judicial review under the Administrative Procedures Act ("APA"). Pursuant to the APA, the court can "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[T]his standard is exceedingly deferential . . . ." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996). "The reviewing court may not substitute its judgment for that of the agency but must, instead, defer to the agency's technical expertise." *City of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1352 (11th Cir. 2005); *see also Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987) ("The NEPA process involves an almost endless series of judgment calls . . . . The line-drawing

decisions necessitated by this fact of life are vested in the agencies, not the courts.").

This court is "required to determine whether the Corps' decision was reasonably supported by the information before it. This does not require that all of the data support the agency's decision." *Envtl. Coal. of Broward Cnty. v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987). "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, (1962)). Specifically with regard to NEPA, "[t]his standard requires substantial deference to the agency, not only when reviewing decisions like what evidence to find credible . . . , but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." *Van Antwerp*, 526 F.3d at 1361.

## IV. DISCUSSION

Plaintiffs' arguments fall into two main categories. The first set of arguments address the decision of the Corps, and concurrence by the Service, that the project may affect, but not likely to adversely affect the listed species under the

ESA. (Doc. 55 at 25-35).[11] Second, Plaintiffs argue the Corps violated NEPA because it did not properly analyze cumulative impacts of the project. (*Id*. at 35-38). The court addresses each below.

## A. "Not Likely to Adversely Affect" Determination under the ESA

Plaintiffs make a number of arguments regarding the Corps' determination that the project may affect but is not likely to adversely affect the listed species under the ESA and the Service's concurrence with that finding. Plaintiffs contend the findings of the Corps are arbitrary and capricious because the Corps: (1) failed to use the best scientific and commercial information available, (doc. 55 at 25-29; doc. 62 at 4-11); (2) unlawfully determined that the Black Creek Mine would not adversely modify critical habitat, (doc. 55 at 29-31) and failed to adequately consider the mine's direct and indirect impacts, (doc. 62 at 11-13); (3) arbitrarily and capriciously relied on the ADEM permit and ASMC's buffer to avoid formal consultation, (doc. 55 at 31-32; doc. 62 at 17-21); and (4) did not complete consultation with the Service, (doc. 55 at 33; doc. 62 at 13-17). Finally, with regard to the Service, Plaintiffs argue it violated the ESA when it arbitrarily and capriciously concurred in the "not likely to adversely affect" finding of the Corps. (Doc. 55 at 33-35; Doc. 62 at 21-22).

---

[11] Page references are to the electronic page numbers assigned by the Clerk of the Court found at the top of each document.

### 1. Use of the Best Scientific and Commercial Information Available

Plaintiffs first contend the Corps ignored available scientific evidence and studies showing that the Black Creek Mine will adversely affect the endangered aquatic species living in the project area and instead "relied on patently deficient species surveys at the site conducted by the mining company's consultants." (Doc. 55 at 26-29; Doc. 62 at 7-11). In support of this argument, Plaintiffs highlight the scientific evidence that sediment from mining is harming the listed species and critical habitat, including the mollusk survey from Dr. Gangloff, the fish survey from Drs. Kuhajda and Neely, and the flattened musk turtle information from Bailey. (Doc. 55 at 26-28; Doc. 62 at 9-10). Plaintiffs contend the Corps did not discuss this information, or attempt to explain why the information and opinions contained therein are wrong. (Doc. 55 at 28). Plaintiffs also point out the fact that the CCR survey failed to find any endangered species at the site. (Doc. 62 at 7).

The vast majority of Plaintiff's argument runs afoul of the highly deferential standard the court must give the agencies decisions in a case such as this one where the court is called upon to review determinations involving the Corps' technical expertise. *See Marsh*, 490 U.S. at 375-78. The standard mandates affirmance of the agency action if a rational basis for the agency's decision is presented, *Bowman Transp. v. Arkansas-Best Freight System*, 419 U.S. 281, 290 (1974), even when the court might otherwise disagree, *United States v. Allegheny–Ludlum Steel*

*Corp.*, 406 U.S. 742, 749 (1972). In other words, courts may not intrude upon the discretion of the agency to choose the course of action to be taken. *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976); *see also Strycker's Bay Neighborhood Council, Inc., v. Karlen¸* 444 U.S. 223, 228 (1980); *North Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1539 (11th Cir. 1990) (the court should set aside administrative decisions only for substantial reasons, "not simply because the court is unhappy with the result reached.").

Despite Plaintiffs' argument to the contrary, the record shows that the Corps considered the information and comments submitted, but determined the additional information did not alter its assessment that the project was not likely to adversely affect the listed species or critical habitat. For example, the Corps addressed the Gangloff report, but reasoned that his observations occurred either upstream or as far as one thousand meters downstream from the confluence of Crooked Creek with Locust Fork. (*See* USACE5912). Similarly, the Corps noted that the majority of the Cahaba Shiners observed in the Kuhajda and Neely report were located upstream of the mouth of Crooked Creek. (*Id.*). Additionally, Bailey's objections to CCR's sampling methods for the flattened musk turtle were rejected, with the exception of the shortened sampling duration.[12] (*Id.*).

---

[12] The court rejects Plaintiffs' argument and scientific evidence regarding coal mines in general. (Doc. 62 at 7-8). This evidence does not support their contention that the Corps' findings regarding Black Creek Mine and whether it will adversely affect the listed species are arbitrary

In short, while Plaintiffs clearly disagree with the weighing of the scientific information by the Corps, it is not the role of this court "to become a tie-breaking technical expert." *Nat. Res. Def. Council v. U.S. Army Corps of Eng'rs*, 2001 WL 1491580, at *9 (S.D. Fla. June 28, 2001). Because the Corps stated a rational basis for its decision – that setbacks, best management practices, and compliance with the NPDES permit will minimize any adverse impacts to a listed species - the highly deferential standard of review prevents the court from second-guessing that decision. Plaintiffs have not presented sufficient evidence to show that the Corps' rationale was arbitrary and capricious in its rejection of the additional surveys and information. *See Sierra Club v. Morton*, 510 F.2d 813, 818 (5th Cir. 1975) (the burden is upon the plaintiffs to establish by a preponderance of the evidence that the decision to proceed was arbitrary and capricious).

## 2. Critical Habitat

In its initial brief in support of summary judgment, Plaintiffs argue "[t]he Corps unlawfully determined that the Black Creek Mine would not adversely modify critical habitat." (Doc. 55 at 21). As the Corps points out, the problem with this argument is that the Corps did not make a finding that the mine would not adversely modify critical habitat. Instead, the Corps found that the mine would not

---

and capricious. Instead, all the evidence shows is that in the abstract coal mines can have an impact on listed species because they can negatively impact water quality. Such evidence is insufficient under the deferential standard.

adversely affect critical habitat. This difference in language is important because in the consultation context, a specific finding as to whether an action would result in the adverse modification of a critical habitat is only required in formal consultation and is the responsibility of the consulting agency, not the action agency. 50 C.F.R. § 402.14(g)(f). Formal consultation is required if the action agency determines that the critical habitat (or listed species) is likely to be adversely affected by an action, something that did not occur here. Instead, where, as here, during informal consultation the action agency determines, with the concurrence of the consulting agency, that the proposed action is not likely to adversely affect the critical habitat (or listed species), the consultation process terminates and no further action required. 50 C.F.R. § 402.13(a). As such, Plaintiffs' argument is misplaced.

In their reply/opposition brief, Plaintiffs admit their "misstatement" regarding modification and then switch gears to argue that the Corps did not consider the mine's direct and indirect impacts of the outfall discharges on critical habitat. (Doc. 62 at 11-13). This argument is similarly misplaced.[13] The record

---

[13] Plaintiffs did not raise this argument in their initial brief. Generally, failure to include argument regarding an issue in the first instance amounts to an abandonment of the claim. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta,* 219 F.3d 1302, 1326 (11th Cir. 2000) (concluding that failure to brief an issue amounts to abandonment of the claim); *McGinnis v. Ingram Equip. Co.,* 918 F.2d 1491, 1496 (11th Cir. 1990) (citations omitted) ("A party normally waives its right to argue issues not raised in its initial brief."); *see also Wilkerson v. Grinnell Corp.* 270 F.3d 1314, 1322 (11th Cir. 2001) (finding that an issue not raised until party's supplemental reply brief deemed abandoned). That being said, the court will addresses

shows that the Corps addressed the mine's likely impact on critical habitat in both its initial and supplemental EAs. (*See* USACE3919-20, USACE5721). Additionally, the Corps considered the impact of pollutants and concluded that because the NPDES permit requires "[a]ll discharges from the sediment ponds . . . to meet NPDES permit limits," compliance with the NPDES permit will ensure that water quality "fall[s] within the recommended ranges for freshwater organisms." (USACE5720-21, USACE1603, USACE2005-06). The NPDES permit specifically addresses the permissible discharge of pollutants, including cyanide, trivalent arsenic, and lead. (USACE1606-07).

While Plaintiffs may disagree with the Corps' ultimate determination regarding the direct and indirect impacts, it is not the role of this court to second guess the technical decisions made. *See Kleppe*, 427 U.S. at 412; *see also Strycker's Bay Neighborhood Council*, 444 U.S. at 228; *Skinner*, 903 F.2d at 1539. The record shows that the Corps examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the decision. *See Motor Vehicle Mfrs. Ass'n of U.S..*, 463 U.S. at 43 (citation omitted).

---

the argument as a more liberal reading of Plaintiffs' brief could arguably be read to include the argument.

### 3. Reliance on Other Permits

Plaintiffs contend the Corps arbitrarily and capriciously relied on the NPDES permit and 100-foot buffer to avoid formal consultation. (Doc. 55 at 31-32). Plaintiffs argue the NPDES permit does not protect listed species and the 100-foot setback is inadequate, especially considering the fact that the buffer is to minimize erosion and sedimentation and not to keep mine-related toxins out of the river. (*Id*.). The court is unpersuaded that the Corps' reliance on the ADEM permit and 100-foot buffer was arbitrary and capricious.

As discussed in detail above, the Corps modified the permit to incorporate other permit requirements as a special condition to reinstatement. Specifically, the permit requires "a minimum setback of 100-feet along Locust Fork and Crooked Creek" and the utilization of "best management practices[14] throughout the life of the project to minimize erosion and sedimentation." (USACE6159). Further, the Corps considered how the water quality standards in the NPDES permit,[15] which require "[a]ll discharges from the sediment ponds" be "within the

---

[14]  Despite Plaintiffs' statement to the contrary, (doc. 55 at 32), best management practices are discussed and described at length in the administrative record. (*See, e.g.,* USAC1625-26; USACE2069-74; USACE2084-93; USACE2183-85).

[15]  NPDES permits, which are issued pursuant to § 402 of the Clean Water Act, are based on standards that limit concentrations of pollutants in "end of pipe" discharges of wastewater. *See* 33 U.S.C. §§ 1311(a) & (b), 1342(2); see also 40 C.F.R. § 122.1. Permittees must monitor and test their effluent, and report the results to the permitting agency, ADEM.  *See* 30 C.F.R. § 715.17(b); 40 C.F.R. § 122.41(l); 33 U.S.C. § 1318(a). Compliance with an NPDES permit and

recommended ranges for fresh water organisms," (USACE5720-21), would "minimize potential adverse impacts to water quality." (USACE5720). The Corps described the requirement of the NPDES permit that "[a]ll surface drainage from disturbed areas be passed through a siltation structure prior to leaving the project boundary" so that those discharges are within the recommended ranges for fresh water organisms. (USACE5721). Because the Corps "ha[d] no reason to believe [Global Met] would not meet the requirements of [its] NPDES permit," it concluded the Black Creek Mine "may affect" but is "not likely to adversely affect" the listed species.[16] (USACE5721).

Contrary to the argument of Plaintiffs, the Corps did not "blindly rely" on other agencies in making its findings. Instead, as the Corps explained, the special conditions were added to the permit to provide the Corps with a means to separately ensure compliance with these requirements. Additionally, there is no reason to assume non-compliance with these requirements. "Administrative action . . . comes before the courts clothed with a presumption of regularity." *Sierra*

the requirements of CWA § 402 thus ensures that the permittee's activities will not adversely impact water quality.

[16] Additionally, before a § 404 permit can issue, the permittee must provide the Corps with a § 401 water quality certification. *See D'Olive Bay Restoration & Pres. Comm., Inc. v. U.S. Army Corps of Eng'rs,* 513 F. Supp. 2d 1261, 1270 (S.D. Ga. Mar. 12, 2007). ADEM issued the required water quality certification on June 16, 2014, finding that "there is reasonable assurance that the discharge resulting from the proposed activities as submitted will not violate applicable water quality standards . . . , provided the applicant acts in accordance with the following conditions as specified." (USACE2005; USACE3905).

*Club*, 295 F. 3d at 1223 (citations omitted).  Plaintiffs have not provided any valid reasons why consideration of the protections provided by overlapping permits that are also designed to limit environmental impacts of the mine as a whole renders the findings arbitrary and capricious.[17]

The court also rejects Plaintiffs' argument that the 100-foot setback is inadequate.  In support of their argument, Plaintiffs cite an earlier recommendation from the EPA for a longer setback in connection with another unrelated project known as Fishtrap Mine #2.  (*See* USACE724-29).  Plaintiffs contend that the recommendation should be read "to refer to all buffers required by SMCRA, not just the one required by Fishtrap Mine #2."  (Doc. 62 at 18).  The court refuses, however, to read such a broad scope into the EPA's recommendation, especially considering the language of the recommendation which specifically refers to the particular mine and its associated ponds. (USACE726).  The EPA did not make a similar recommendation here, when it was clearly free to do so.[18]

---

[17] Furthermore, to the extent that Plaintiffs' argument challenges the effluent limits in the NPDES permit, an attack on the § 404 permit is not the proper vehicle. Sections 404 and 402 establish two mutually exclusive permitting programs: § 404 for "dredging or filling" activities, and § 402 for the discharge of pollutants. 33 U.S.C. §§ 1342, 1344; *see Friends of the Crystal River v. EPA*, 35 F.3d 1073, 1075 (6th Cir. 1994) (noting that §§ 402 and 404 provide for two discrete permitting systems).  The correct way to challenge the NPDES permit as inadequate to protect water quality in the Locust Fork is through ADEM, the action agency. In fact, Plaintiffs did bring that challenge, but did not succeed.  (USACE1587; Doc. 60 at 18).  Plaintiffs may not use the § 404 permit to re-litigate that issue.

[18] The EPA also has veto authority over § 404 permits.  33 U.S.C. § 1344(c).  If the EPA believed that operation in compliance with the permit would have an adverse impact on a listed species or critical habitat, it could have vetoed the permit.

## 4. Completion of Consultation with the Service

Plaintiffs also argue the Service did not explicitly concur in writing as to whether the mine would adversely modify critical habitat, and, as such, the Corps never finished consultation, thereby violating its procedural and substantive duties under the ESA. (Doc. 55 at 33). As detailed above, the Corps consulted with the Service on two separate occasions. In both instances, the Corps expressly stated that the Locust Fork was designated as a critical habitat for six mussel species. (USACE4425; USACE5518). Both times the Corps determined the § 404 permit for the mine was not likely to adversely affect either a listed species or designated critical habitat for the six mussels and asked the Service to concur in its determination. (USACE4424-25; USACE5517-18; USACE5912-13). In the latter concurrence, the Service thoroughly summarized the findings of the Corps and stated: "[b]ased upon a review of our records and the information provided in your letter, we concur with your determination that the project actions may affect, but are not likely to adversely affect the listed species mentioned above." (USACE5915-16).

Plaintiffs are correct that the final concurrence letter from the Service omits the phrase "critical habitat" from the last sentence of its letter. That being said, "[i]n administrative law . . . there is a harmless error rule." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 659-60 (2007) (citations omitted).

An administrative body's APA deficiency is not prejudicial "'when [it] is one that clearly had no bearing on the procedure used or the substance of decision reached.'" *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir.1979) (quoting *Braniff Airways, Inc. v. C.A.B.*, 379 F.2d 453, 466 (D.C. Cir. 1967)); *see also Ga. River Network v. U.S. Army Corps of Eng'rs*, 2012 WL 930325, at *22-23 (S.D. Ga. Mar. 19, 2012). Determining whether an APA deficiency is harmless demands a case-specific inquiry involving "an estimation of the likelihood that the result would have been different, . . . and a hesitancy to generalize too broadly about particular kinds of errors when the specific factual circumstances in which the error arises may well make all the difference." *Shinseki v. Sanders*, 556 U.S. 396, 412 (2009).

Here, it is clear from the other language in the letter and the history of the informal consultation for the project that the Corps' decision included the critical habitat for the six mollusks. The record establishes that the Service concurred in the entire determination by the Corps and not just the one regarding the listed species. To be sure, the Service did not issue a letter of non-concurrence regarding the critical habitat. Considering the administrative record as a whole, the court

concludes that the omission by the Service of the phrase "critical habitat" from the final concurrence sentence amounts to harmless error.[19]

### 5. Concurrence by the Service

In Plaintiffs' final EPA argument, they contend the concurrence by the Service was arbitrary and capricious because it changed its opinion that the Corps should conduct additional surveys with regard to the flattened musk turtle and the Black Warrior waterdog without any explanation. (Doc. 55 at 33-35; Doc. 62 at 21-22). The court disagrees for the following reasons.

In its January 2017 letter, the Service noted contradictions in the surveys provided by Global Met and those provided by the other experts submitted on behalf of Plaintiffs. (USACE5902-09). The Service "recommend[ed] that the new information presented by Dr. Gangloff, and Drs. Kuhajda and Neely be assessed by the Corps" and that "given the improperly shortened [flat musk turtle] survey, and . . . the new status of [Black Warrior waterdog] as proposed for listing as endangered, the Corps should obtain additional surveys for those two species." (USACE5909).

---

[19] Because of this conclusion, the court rejects Plaintiffs argument that formal consultation was required with regard to the critical habitat. (Doc. 62 at 14-15). Formal consultation is only required when the consulting agency does not concur in the may affect but not likely to affect conclusion. *See* 50 C.F.R. § 402.13(a). As explained by the court, the record is clear that the Service concurred in the Corps' conclusion regarding both the endangered species as well as the critical habitat, despite the omission of "critical habitat" from the final concurrence by the Service.

Afterwards, the Corps went back and considered the studies. It determined that additional surveys were unnecessary because they would not change the decision. (USACE5517-18). Specifically, in the Supplemental EA, the Corps stated:

> The [Corps] <u>reviewed the letters and survey reports submitted.</u>[20] The [Corps] agrees with the [Service] that the sampling length for the flattened musk turtle was improperly shortened by CCR. The [Corps] also recognizes the Black Warrior waterdog has recently been proposed for listing as endangered under the ESA. The [Corps] understands there is suitable habitat for the flattened musk turtle and Black Warrior waterdog in Locust Fork adjacent to the proposed mine site; however <u>the presence or absence of these species does not change the [Corps'] effects determination.</u> The applicant has not proposed direct impacts to the Locust Fork[21]; therefore the [Corps] will not require additional surveys for the flattened musk turtle and Black Warrior waterdog.

(USACE5720) (emphasis added). The Corps further explained that "[a]ll surface drainage from disturbed areas must be passed through a siltation structure prior to leaving the project boundary. (*Id*.). The Corps reasoned that the project includes "a minimum setback of 100-feet along Locust Fork and Crooked Creek" and utilizes best management practices "to minimize erosion and sedimentation to avoid adverse effects" to species and critical habitat. (USACE5721). As such, the

---

[20] As detailed above, the Supplemental EA details a thorough review of the additional information submitted.

[21] The EA stated that the "steams proposed for impact are ephemeral and intermittent streams" (USACE5725) and delineated that "direct effects involve the discharge of fill material into 5,920 linear feet of ephemeral stream, 3,840 of intermittent stream and 0.72 acre of wetlands." (USACE5735).

Corps concluded that the presence or absence of any listed species in Locust Fork would not change its determination.

Thereafter, the Service concurred with this determination. (USACE5915-16). Rather than changing its decision without explanation, the Service noted the initial effects determination, review of the new information and surveys by Bailey, Shelton, Gangloff, Kuhajda and Neely, and its earlier recommendations to the Corps. However, based on a new review of the record and the Corps' explanations for not conducting the new surveys, the Service concurred with the "may affect, but are not likely to adversely affect" determination regarding all the listed species. (*Id*).

Based on the above, the court cannot conclude that the Service was arbitrary and capricious in its concurrence in the Corps' determination. Instead, the administrative record establishes that the Service fulfilled its obligations of informal consultation, as required by the EPA. The Service reviewed the record and made recommendations to the Corps. The Corps then responded to the recommendations and provided reasons why the two additional surveys were not necessary. The Service considered the Corps' response, reviewed the entire record, and concurred. While Plaintiffs clearly disagree with the concurrence, the informal consultation process was followed, and Plaintiffs have not established that the concurrence was arbitrary and capricious.

## B.  Cumulative Impacts Analysis under NEPA

As explained above, NEPA requires the Corps to assess the cumulative impacts of a § 404 permit.  See 40 C.F. R. § 1508.7.  NEPA's mandate to the agencies is "essentially procedural . . . .  It is to insure a fully informed and well-considered decision."  *Vermont Yankee*, 435 U.S. at 558.  "NEPA requires federal agencies to take a 'hard look' at the environmental consequences of their actions, but the statute does not specify how an agency should determine the scope of its NEPA analysis."  *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 194 (4th Cir. 2009) (citation omitted).  A reasonable cumulative impacts analysis includes a review of the following: "(1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions - past, present, and reasonably foreseeable proposed - that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate."  *D'Olive Bay Restoration & Pres. Comm., Inc.,* 513 F. Supp. 2d at 1292-93 (quoting *Georgia River Network v. U. S. Army Corps of Eng'rs*, 334 F. Supp. 2d 1329 (D. Ga. 2003).  Once an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences; it cannot "interject itself within the area of discretion

of the executive as to the choice of the action to be taken." *Strycker's Bay*, 444 U.S. at 227-28 (citing *Kleppe*, 427 U.S. at 410 n 21); *see also Southwest Williamson Cnty. Cmty. Ass'n, Inc. v. Slater*, 243 F.3d 270, 278 (6th Cir. 2001) (NEPA is not result-oriented; rather, it "compels agencies to collect and disseminate information about the environmental consequences of proposed actions that fall under their respective jurisdictions.").

The record amply shows that the Corps considered the cumulative effects of the permit as required by NEPA. The EA contains an entire section devoted to cumulative impacts, covering a wide geographic area of both the Middle and Lower Locust Fork watersheds. The Corps evaluated the historical mining use of the area and acknowledged that coal mining and timber removal activities have occurred in the region for several decades, but found that these "pre-SMCRA and pre-CWA impacts are relevant as they set a baseline condition for water quality and aquatic habitat values within the watershed." (USACE5737). The Corps also evaluated the currently active mines and found that for the past 15 years there were 108 permits authorizing impacts to 3% of the perennial steams in the watershed. (USACE5949-50). The active surface mines comprise 6,757 acres and impact approximately 1.6% of the 429,373 acres in the Middle and Lower Locust Fork watersheds. (*Id*.). The Corps acknowledged that ADEM placed the Locust Fork

on its § 303(d) list, but noted that the list attributes the impairment to agriculture and abandoned surface mines.  (USACE5738).

Notwithstanding, the Corps' review of water quality information revealed that "water quality associated with streams in this watershed has not been significantly impacted by permitted mining activities." (USACE5742, USACE5950).  The Corps found that "the watershed would continue to assimilate the mining activities that are occurring within the watershed provided those activities are conducted in accordance with the terms and conditions of the SMCRA and CWA authorizations." (USACE5742).  Thus, the Corps concluded that if the project is "conducted in accordance with all applicable state and Federal regulations," it "should not contribute to or result in cumulative significant adverse impacts to the aquatic or human environment with in the Middle and Lower Locust Fork watershed." (USACE5954).

Plaintiffs contend the Corps failed "to adequately account for the cumulative impacts of degraded water quality of . . . streams downstream or adjacent to mines." (Doc. 62 at 23).  Plaintiffs specifically point to the 69 coal mines in the Lower and Middle Locust Fork and argue the Corps summarily concluded these mines are unlikely to have cumulative impacts.  The court disagrees.  Instead, the Corps recognized that pre-SMCRA mining activities had impacted the environment but concluded current mining regulations are more rigorous and

ensure that current mining operations will not contribute to a decrease in water quality.[22] (USACE5745-46). The Corps also noted that abandoned surface mines and agriculture are the stated reason that the Locust Fork appears on ADEM's § 303(d) list. (USACE5738). The Corps, therefore, concluded that any water quality issues would be addressed through the NPDES permit for the Black Creek Mine along with the other conditions within the permit. (USACE3944-45, USACE5734). While Plaintiffs may not agree with the explanation provided by the Corps or the conclusions made, the court's "only role [under NEPA] is to ensure that the agency has taken a 'hard look'" at environmental impacts of a proposed action. *Fund for Animals*, 85 F.3d at 546 (citation omitted). This it has done.

Plaintiffs also argue that the cumulative impacts assessment should have included consideration of a Cumulative Hydrologic Impact Assessment ("CHIA"), required by ASMC. (Doc. 55 at 36-38; Doc. 62 at 25-26). Again, the court disagrees. The Corps is entitled to rely on its own expertise in determining the best methodology for evaluating cumulative impacts and courts do not "call into question any reasonable agency methodologies used in arriving at its conclusion." *Protect Key West v. Cheney*, 795 F. Supp. 1552, 1559 (S.D. Fla. 1992). Plaintiffs

---

[22] Additionally, the Corps noted that of the 69 mines referenced by Plaintiffs, many are abandoned and in a state of reclamation. (USACE5739). As more land is reclaimed, the Corps reasoned that the overall health of watershed can be expected to improve. (USACE5742).

do not explain what information that would be in the CHIA was overlooked by the Corps in its cumulative analysis evaluation. As explained above, the Corps reasonably concluded that the Black Creek Mine is "not likely to adversely affect" the aquatic environment because a 100-foot buffer, sediment ponds, and best management practices will minimize impacts on water quality. As numerous courts have concluded, NEPA "does not require the Corps to wait for other agencies to complete their studies . . . ." *Ark. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 431 F.3d 1096, 1101 (8th Cir. 2005) (citation omitted); *Tinicum Tp., Pa. v. U.S. Dep't of Transp.*, 685 F.3d 288, 296 (3d Cir. 2012) ("While additional data might enable a more detailed environmental analysis, NEPA does not require maximum detail. Rather, it requires agencies to make a series of line drawing decisions based on the significance and usefulness of additional information."); *Town of Winthrop v. F.A.A.*, 535 F.3d 1, 11 (1st Cir. 2008) ("There will always be more data that could be gathered; agencies must have some discretion to decide when to draw the line and move forward . . . .").

Simply put, Plaintiffs have not shown that the cumulative impact analysis is deficient under NEPA. This is not a case where the Corps merely listed past actions and did not provide a detailed analysis. Instead, the Corps reasonably considered the available evidence and concluded that the Locust Fork watershed "is sufficiently absorbing the impacts without significant aquatic impairment

and/or degradation." (USACE5745). The court's "only role [under NEPA] is to ensure that the agency has taken a 'hard look'" at environmental impacts of a proposed action. *Fund for Animals*, 85 F.3d at 546 (citation omitted). Compliance with NEPA is to be judged against a "rule of reason" to "avoid placing extreme or unrealistic burdens on the compiling agency." *Isle of Hope Historical Ass'n v. U.S. Army Corps of Eng'rs*, 646 F.2d 215, 220 (5th Cir. Unit B 1981).[23] Based on the foregoing, the court concludes the Corps acted reasonably and took the required "hard look" at environmental impacts, including cumulative impacts, as required by NEPA.

## V. CONCLUSION

Based on the foregoing, Defendant's motions for summary judgment (docs. 59, 61) are due to be granted and Plaintiffs' motion for summary judgment (doc. 54) is due to be denied. A separate order will be entered.

**DATED** this 14th day of December, 2018.

John E. Ott

_____
**JOHN E. OTT**
Chief United States Magistrate Judge

---

[23] Decisions by a Unit B panel of the former Fifth Circuit are binding precedent in the Eleventh Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).